UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANTHONY TABATZNIK,

                Plaintiff,

v.

ANDREW TURNER,

                Defendant.

14 Cv. 8135 (JFK)

**AFFIDAVIT OF PLAINTIFF ANTHONY TABATZNIK**

---

**STATE OF** _____) ss:

**COUNTY OF** _____)

I, Anthony Tabatznik, do hereby depose and say:

1.    I am over the age of eighteen and make this Affidavit under oath. Unless otherwise specified, the facts set forth below are true and correct to the best of my personal knowledge. Otherwise, they are true to the best of my knowledge and belief, and I have identified the basis for that knowledge and belief.

2.    On September 13, 2011, I lent to Andrew Turner the sum of £2,425,000. I made the loan pursuant to a promissory note (the "Note") that Mr. Turner executed and returned to my attorney, Austin Witt, Esq., on or about September 13, 2011. The Note was scheduled to mature on its tenth anniversary—that is, September 13, 2021. A true and correct copy of the Note is attached as Exhibit A.

3.    The loan's stated purpose was to facilitate certain transactions involving four companies with which Mr. Turner was affiliated: (i) THP-Parkhouse, Ltd. ("THP"); (ii) Parkhouse Manor Care Homes Limited ("Parkhouse"); (iii) Aston Care Homes Limited

("Aston"); and (iv) to a lesser extent, Turner Healthcare Properties, Ltd. Ex. A at 4 § 4. Those transactions primarily concerned the purchase by THP of a forty-eight bedroom care home in Scotland known as Parkhouse Manor, as well as a related loan from THP to Aston (collectively, the "Purchase Transactions"). *See id*. at 3; *id*. at 4 § 4.

4. The Note requires Mr. Turner to repay the loan, together with accrued interest of 8% per year, according to the following payment schedule: (i) one payment on September 30, 2012, in the amount of £1,700,000; (ii) eight annual payments of £80,000 on September 30th of each year through 2020; and (iii) a final payment of £85,000, together with all accrued and unpaid interest, at maturity. *See* Ex. A at 3 § 2, 4 § 3. The Note states that interest shall be computed on the unpaid principal amount of the loan and any overdue amounts "on the basis of a year of 365/366 days and paid for the actual number of days elapsed (including the first day but excluding the last day)." *Id.* at 1, 4 § 3. In the event of a payment default, the Note permits me to charge increased interest on overdue amounts at a rate of 10% per year. *Id.* at 4 § 3. The Note does not specify any contingencies or conditions that must be satisfied in order to trigger Mr. Turner's repayment obligations. In addition, the Note requires Mr. Turner to pay all of my "reasonable out-of-pocket costs and expenses," including attorneys' fees, associated with the Note, any modifications of the Note, and any Events of Default (as that term is defined in the Note). *See id*. at 14 § 17.

5. The Note does not require me to do anything other than supply Mr. Turner with the loan funds. *See id.* at 1-17. I completed this obligation on September 13, 2011 when, at Mr. Turner's direction, I wired the principal sum of £2,425,000 to the escrow account of the solicitors at Brodies LLP, who were advising Mr. Turner on the Purchase Transactions.

6. According to Section 12 of the Note, any failure by Mr. Turner to, among other things, "make payment when due, whether at stated maturity, by acceleration or otherwise, of any principal on the Loan," constitutes an Event of Default. *Id.* at 11 § 12(a). In such circumstances, the Note entitles me to accelerate the repayment of the Note and demand that Mr. Turner immediately pay it in full. *See id.* at 13 § 12. There is no requirement that I first provide Mr. Turner with any notice or make any formal demand. *Id.* at 13.

7. The first payment under the Note was due on September 30, 2012, in the amount of £1,700,000. *See id.* at § 11-13, § 12(a). Mr. Turner never paid me those funds. This was the first Event of Default (the "First Event of Default"). Instead, on or about such date, Mr. Turner contacted me and asked for more time.

8. In an effort to accommodate Mr. Turner's request, I agreed to give him an additional few months to pay. When Mr. Turner did not pay by early 2013, our attorneys began discussing forbearance options. We ultimately agreed through our respective counsel on or about May 28, 2013, that I would forgo exercising my rights in connection with the First Event of Default until August 30, 2013, provided that: (i) Mr. Turner make a principal payment on or before May 31, 2013, in the amount of £100,000; and (ii) the maturity date of the Note would be shortened to August 30, 2013 (the "First Forbearance"). When the forbearance period expired on that date, my rights to pursue relief under the Note for the First Event of Default would resume. Attached as Exhibit B is a true and correct copy of the e-mail exchange between my attorney and Mr. Turner's attorney that memorializes the First Forbearance.

9. I received Mr. Turner's forbearance payment of £100,000 substantially in accordance with the agreed upon terms. Mr. Turner again did not, however, make the required payment on August 30, 2013 (which was the new maturity date of the Note pursuant to the First

Forbearance). Rather, instead of paying the required funds, Mr. Turner advised me by e-mail on August 30, 2013—the agreed date for full repayment of the loan—that he had "reached a verbal agreement with a buyer" for Parkhouse Manor. According to Mr. Turner, the deal would take "a couple of months" for him to complete. A true and correct copy of the e-mail is attached as Exhibit C.

10. The Note confers upon me a "legal, valid, enforceable and perfected security interest in" Parkhouse Manor. *See* Ex. A at 8 § 9(p). It also requires Mr. Turner to pre-pay the Note with the proceeds of any sale of that property. *See id.* at 4 § 6(a). Accordingly, Parkhouse Manor was effectively serving as collateral for the Note.

11. I therefore agreed to another forbearance arrangement (the "Second Forbearance") so that Mr. Turner could sell the property and generate the money to repay the Note. This time, the forbearance took the form of a written agreement that Mr. Turner signed and returned to my counsel on September 25, 2013. It became effective on September 27, 2013, and was dated accordingly. By then, Mr. Turner had indicated that he would not pay the £80,000 that would become due on September 30, 2013, under the Note and he, in fact, failed to make this payment (the "Second Event of Default").

12. Accordingly, at Mr. Turner's request, I agreed in the Second Forbearance to refrain until November 30, 2013, from exercising my rights under the Note with respect to the First Event of Default and the forthcoming Second Event of Default, provided that Mr. Turner agreed to make a £100,000 principal payment as a condition precedent to the Second Forbearance becoming effective as well as a second principal payment of £225,000 by November 1, 2013. In addition, Mr. Turner explicitly acknowledged that the outstanding principal balance on the Note was £2,325,000 as of September 27, 2013, and waived any

purported argument that the obligation should be eliminated or reduced for any reason. As with the earlier forbearances, I reserved all rights to pursue the remedies to which I am entitled for the First and Second Events of Default as soon as the forbearance period expired. Attached as Exhibit D is a true and correct copy of the fully executed Second Forbearance, together with a transmittal e-mail dated September 25, 2013, from my attorney, Austin Witt, Esq., to the attorney who represented Mr. Turner at the time, D. Douglas Matson, Esq. As the e-mail reflects, Mr. Turner and I were both copied on that transmission.

13.   I received a wire of £100,000 from Mr. Turner on or about September 27, 2013 and another wire of £219,584.93 from Mr. Turner on or about November 12, 2013. Although the November 12, 2013 payment was late and less than what it should have been, it is my understanding that this payment of £219,584.93 was an attempt by Mr. Turner to make the payment of £225,000 that was due on November 1, 2013 under the Second Forbearance. I did not, however, receive any payment from Mr. Turner when the Second Forbearance expired on November 30, 2013. Instead, Mr. Turner informed me in early December 2013 that he was attempting to "refinance" the terms of our loan. Once again, he claimed to need more time.

14.   We agreed on December 10, 2013, to a final forbearance arrangement (the "Third Forbearance"). The terms of the Third Forbearance were, in all material respects, the same as those of the Second Forbearance, except that: (i) the new forbearance period ended on January 31, 2014; (ii) the new forbearance payment would be £205,415.07; (iii) Mr. Turner agreed to be responsible for certain fees and expenses incurred by U.S. counsel (in the amount of $12,000) and Scottish counsel (in the amount of £4,383) in connection with the loan and the Third Forbearance; and (iv) Mr. Turner explicitly acknowledged that the outstanding principal balance on the Note was £2,005,415.07 as of November 29, 2013. As I previously had done, I reserved

all rights to pursue my remedies under the Note for the First and Second Defaults as soon as the Third Forbearance expired. Attached as Exhibit E is a true and correct copy of the fully executed Third Forbearance, together with a transmittal e-mail dated December 10, 2013, from my attorney, Austin Witt, Esq., to the attorney who represented Mr. Turner at the time, D. Douglas Matson, Esq. As the e-mail reflects, Mr. Turner and I were both copied on that transmission.

15. I received the forbearance payment of £205,415.07 by wire transfer on December 13, 2013. I have not received any other payments from Mr. Turner since that date.

16. The Third Forbearance expired on January 31, 2014, and was not renewed. Accordingly, on February 12, 2014, I had my attorney send to Mr. Turner a letter in which I notified Mr. Turner of various defaults, including the payment default, and reserved my rights (the "February Letter"). The February Letter further advised Mr. Turner that I would be charging interest at the default rate of 10% per year from that day forward, as provided in Section 3 of the Note. In a separate letter that my attorney sent to Mr. Turner on March 21, 2014, I exercised my rights pursuant to Section 12 of the Note and demanded that Mr. Turner repay the full balance of the Note immediately. I repeated my demand for repayment in full on June 30, 2014, through another letter that my attorney sent to Mr. Turner's counsel, and again on July 9, 2014, through an e-mail that my attorney sent to Mr. Turner's attorney. Mr. Turner has not complied with any of these demands. Attached as Exhibit F are true and correct copies of the three letters and the e-mail referenced in this Paragraph.

17. Through separate guaranties executed on the same day as the Note, both THP and Parkhouse "absolutely, unconditionally and irrevocably guarantee[d] as primary obligor and not merely as surety, the full and punctual payment" of the Note "when due, whether at stated maturity or earlier, by reason of acceleration . . . or otherwise." Nevertheless, neither the Note

6

nor the guaranty agreements require me to pursue remedies against the guarantors before seeking to enforce the Note against Mr. Turner. True and correct copies of these guaranty agreements are attached as Exhibit G.

18. To date, Mr. Turner has paid a total of just £625,000 in principal, all of which derives from the forbearance payments. Accordingly, the outstanding principal balance of the loan is £1,800,000.

19. Mr. Turner has paid a total of £129,333 in interest to date, consisting of eight monthly payments of £16,666.66 each that accrued at the "normal" rate of 8%, which resulted in an overpayment of approximately £13,185. I received the last interest payment on or about January 31, 2014. The loan subsequently accrued interest of: (i) £4,339.72 at the "normal" 8% interest rate between February 1, 2014, and February 11, 2014; and (ii) £169,643.60 at the higher default interest rate of 10% between February 12, 2014, and January 21, 2015. *See supra* ¶ 16 & Ex. F. As of January 21, 2015, Mr. Turner therefore owes me a total of £156,458.60 in accrued, but unpaid, interest. It is my understanding that interest will continue to accrue at the 10% default rate, which amounts to approximately £493.15 per day, until the Court enters a judgment in this matter.

20. I affirm under penalty of perjury that the foregoing is true and correct.

_____
Anthony Tabatznik

SWORN TO AND SUBSCRIBED before me
This 21st day of January, 2015

_____
NOTARY PUBLIC FOR State of New York
MY COMMISSION EXPIRES: 9/23/18

ALLISON BETH TEITLER
NOTARY PUBLIC-STATE OF NEW YORK
No. 02TE6145945
Qualified in Queens County
My Commission Expires September 23, 2018

7