USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __03/30/2016__

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------X

ANTHONY TABATZNIK,                     :
                                   :
             Plaintiff,   :
                                   :     No. 14 Civ. 8135 (JFK)
   -against-                :
                                   :     **OPINION & ORDER**
ANDREW TURNER,                         :
                                   :
             Defendant.   :

----------------------------------X

APPEARANCES

FOR ANTHONY TABATZNIK
    Danielle L. Rose
    Kimberly Perrotta Cole
    Rebecca G. Mangold
    KOBRE & KIM LLP

FOR ANDREW TURNER
    Victoria P. Lane
    Nathan R. Sabourin
    HINCKLEY, ALLEN & SNYDER

**JOHN F. KEENAN, United States District Judge:**

Before the Court are Plaintiff Anthony Tabatznik's motions (1) for summary judgment to enforce the amount owed on a promissory note (the "Note") and (2) for interest, fees, and costs.

With respect to the motion for summary judgment, Defendant Andrew Turner does not dispute that he is liable under the Note but contends that the amount of his liability should be reduced to account for Mr. Tabatznik's alleged failures (1) to mitigate damages in connection with the Note and (2) to dispose of

collateral securing the Note in a commercially reasonable manner. Because the Court finds that Mr. Tabatznik has met his burden in establishing Mr. Turner's liability and that Mr. Turner's asserted defenses are precluded as a matter of law, Mr. Tabatznik's motion for summary judgment is granted.

As to Mr. Tabatznik's motion for interest, fees, and costs, Mr. Turner again does not dispute that he is liable for prejudgment interest, as well as reasonable fees and costs. However, he contends that the attorney's fees and costs sought by Mr. Tabatznik are not sufficiently substantiated and are unreasonable, and that a lower rate of prejudgment interest should apply. The Court finds that (1) pursuant to the Note, Mr. Tabatznik is entitled to prejudgment interest at the rates sought; (2) Mr. Tabatznik is entitled to attorney's fees and partial costs for the work of his Kobre & Kim LLP counsel at the reduced amounts set forth below; and (3) Mr. Tabatznik has failed to provide sufficient information to determine the reasonableness of (a) the fees of his counsel at the law firm of Maclay Murray & Spens LLP or (b) the 2 percent administrative fee charged by his counsel at Kobre & Kim. Accordingly, Mr. Tabatznik's motion for interest, fees, and costs is granted in part and denied in part.

## I. Background

### A. The Note

Plaintiff Anthony Tabatznik and Defendant Andrew Turner entered into the Note on September 13, 2011. (See Pl.'s 56.1(d) Statement ¶ 1 [hereinafter "56.1(d) Statement.])  Pursuant to the Note, Mr. Tabatznik loaned Mr. Turner £2,425,000 to facilitate certain transactions involving four companies with which Mr. Turner was affiliated:  (1) THP-Parkhouse, Ltd. ("THP"); (2) Parkhouse Manor Care Homes Limited ("Parkhouse Manor"); (3) Aston Care Homes Limited ("Aston"); and (4) Turner Healthcare Properties, Ltd. (Id. ¶¶ 1-2.)  The transactions primarily related to the purchase by THP of a forty-eight-bedroom care home in Scotland known as Parkhouse Manor, as well as a related loan from THP to Aston. (Id. ¶ 2.)

The Note requires Mr. Turner to repay the principal under the loan as follows: (a) £1,700,000 on September 30, 2012; (b) £80,000 annually, on September 30 of each year, through 2020; and (c) £85,000 plus all accrued and unpaid interest on September 13, 2021, when the Note matures. (Id. ¶ 8.)  Pursuant to the Note, Mr. Turner is also obligated to pay interest at a rate of 8 percent per annum on the unpaid principal balance of the loan. (Id. ¶ 9.)

The Note specifies more than 16 occurrences that constitute "Events of Default," including any failure by Mr. Turner "to

3

make payment when due, whether at stated maturity, by acceleration, or otherwise, of any principal on the Loan." (Id. ¶ 12.)  In the event of a default, certain rights and obligations are triggered.  First, the Note provides Mr. Tabatznik with the option to, by written notice to Mr. Turner, accelerate payment by "declar[ing] the Loan to be forthwith due and payable, together with accrued interest." (Id. ¶ 15.)  In addition, "in the case of any overdue amounts of principal or interest," Mr. Turner is required to pay interest on those amounts at an increased rate of 10 percent upon demand by Mr. Tabatznik. (Id. ¶ 13.)  The Note further requires Mr. Turner to pay or reimburse Mr. Tabatznik for "all reasonable out-of-pocket costs and expenses of [Mr. Tabatznik] (including, without limitation, the reasonable fees and expenses of legal counsel) in connection with . . . any Default and any enforcement or collection proceedings resulting therefrom . . . ." (Id. ¶ 14.)

With respect to choice of law, the Note provides that it "shall be governed by and construed in accordance with the law of the State of New York, without regard to conflicts of law principles thereof." (Id. ¶ 16.)  The parties also submitted to the nonexclusive jurisdiction of the state and federal courts of New York "in any action or proceeding arising out of or relating to [the] Note." (Id. ¶ 17.)

4

Under the Note, Mr. Turner agreed to "pay all amounts due under any Loan Document . . . without set-off or counterclaim." (Second Decl. of Rebecca G. Mangold Ex. 1 § 7 [hereinafter "Second Mangold Decl."])

## B. Guaranty and Security Agreements

Through separate agreements executed the same day as the Note, both THP and Parkhouse Manor guaranteed Mr. Turner's obligations under the Note. (See Aff. of Anthony Tabatznik Ex. G. [hereinafter "Tabatznik Aff."])

THP and Parkhouse Manor also executed three agreements (two "Floating Charges" and one "Standard Security Agreement," together the "Security Agreements") in Mr. Tabatznik's favor creating security interests in the personal property, goodwill, and other assets associated with Parkhouse Manor, as well as in Parkhouse Manor's real property. (See Second Mangold Decl. Exs. 2-3.)  Each of the Security Agreements contain a choice-of-law provision stating that it "shall be governed by[,] and construed in accordance with[,] the laws of Scotland." (Id. Ex. 2 § 25.1; id. Ex. 3 § 15.1.)  Mr. Turner is not a party to the Security Agreements. (See id. Exs. 2-3)

## C. Defaults and the First and Second Forbearance Agreements

The first payment under the Note in the amount of £1,700,000 was due September 30, 2012. (56.1(d) Statement ¶ 20.)

Mr. Turner failed to make this payment. (Id.)  It is undisputed that this constituted the first Event of Default. (Id.)

On May 28, 2013, the parties agreed to the first of three forbearance arrangements (the "First Forbearance"). (Id. ¶ 22.) Under the First Forbearance, Mr. Turner made a principal payment of £100,000 and agreed to shorten the maturity date of the Note to August 30, 2013. (Id.)  In exchange, Mr. Tabatznik agreed to forego his rights in connection with the first Event of Default until August 30, 2013, but reserved all rights to pursue relief under the Note after that time. (Id.).

When the First Forbearance expired, Mr. Turner failed to pay the remaining balance on the Note. (Id. ¶ 23.)  In an e-mail dated August 30, 2013, Mr. Turner represented to Mr. Tabatznik that he had reached a verbal agreement to sell Parkhouse Manor, that the agreement required him to obtain a mortgage on the property, and that the process would probably take "a couple of months" to complete. (See Tabatznik Aff. Ex. C).  In response, Mr. Tabatznik agreed to another forbearance arrangement (the "Second Forbearance"), effective through November 30, 2013, to allow Mr. Turner to sell the property and generate funds to repay the Note. (56.1(d) Statement ¶ 26.)  The agreement called for Mr. Turner to make principal payments of £100,000 and £225,000. (Id. ¶ 29.)  Mr. Turner made the first payment in full but paid only £219,584.93 of the second payment. (Id. ¶ 32.)

Under the Second Forbearance, Mr. Turner also agreed to a
provision providing for the waiver of his claims and defenses
under the Note. (Second Mangold Decl. Ex. 14 § F.2.)

### D. Valuation of Parkhouse Manor

In connection with Mr. Turner's attempt to sell Parkhouse
Manor, he engaged Christie & Co., a professional brokerage firm
in the United Kingdom, to perform an independent valuation.
(Aff. of Andrew Turner ¶ 11 [hereinafter "Turner Aff."])  On
November 6, 2013, Christie & Co. issued a report that included
three separate valuations for Parkhouse Manor depending on the
circumstances of the sale.  Christie & Co. estimated that (1) if
Parkhouse Manor were sold as a solvent, operating business, its
market value would be £2,500,000; (2) if Parkhouse Manor were
sold as an operating business, but in a distressed condition
with a receiver or third party appointed to realize sale of the
assets, and with accounts and records not available for
inspection, the market value would be £1,825,000; and (3) if
Parkhouse Manor were sold while not in operation, with a
receiver or third party appointed to realize sale of the assets,
and with fixtures removed but licenses and permits in place, the
market value would be £1,100,000. (Turner Aff. Ex. B. at 2, 6,
31.)  Each of these valuations "exclude[d] any liability that
arises or could arise in respect of VAT [value added tax],

7

taxation and the costs of acquisition or realisation." (Id. at 31.)

### E. Third Forbearance

After the expiration of the Second Forbearance on November 30, 2013, the parties entered into a third and final forbearance on December 10, 2013 (the "Third Forbearance"). Under the Third Forbearance, which was effective through January 31, 2014, Mr. Turner acknowledged that the outstanding principal balance on the Note was £2,005,415.07 as of November 29, 2013. (56.1(d) Statement ¶ 35.) Mr. Turner subsequently made a forbearance payment of £205,415.07 on December 13, 2013, leaving a principal balance of £1,800,000.00. (56.1(d) Statement ¶ 38.) As with the Second Forbearance, the Third Forbearance contained a provision providing for the waiver and release of Mr. Turner's claims and defenses under the Note. (Second Mangold Decl. Ex. 15 § F.2.)

### F. Insolvency and Administration Petition

Shortly before the Second Forbearance expired at the end of January 2014, Mr. Tabatznik learned of an unpaid tax assessment against Parkhouse Manor in the amount of £134,260.03. (First Decl. of Timothy James Edward ¶ 11 [hereinafter "First Edward Decl."]; Decl. of Iain Mackenzie Young Ex. 1 [hereinafter "Young Decl."]) Mr. Tabatznik also learned that Parkhouse Manor had been involuntarily placed into insolvency proceedings following a petition by Her Majesty's Revenue and Customs ("HRMC"), the

United Kingdom's tax authority. (First Edward Decl. ¶ 11; Young
Decl. Ex. 1 at 6.)  In response to that petition, the Glasgow
Sheriff Court in Scotland had appointed a provisional liquidator[1]
to take control of Parkhouse Manor. (Young Decl. Ex. 1., at 6.)

On February 13, 2014, as a secured creditor of Parkhouse
Manor per the Guaranty and Security Agreements, Mr. Tabatznik
petitioned the Glasgow Sheriff Court for an order placing
Parkhouse Manor into administration—a statutory process in the
United Kingdom governed by the Insolvency Act 1986, of which the
closest equivalent in the United States is Chapter 11
bankruptcy. (See Young Decl. ¶ 7; id. Ex. 1.)  The goal of
administration would be to pull the company out of insolvency,
or if that was not possible, to secure a better recovery for the
company's creditors than would be possible through liquidation.
(See id. Ex. 1, at 3; Stephen Aff. ¶ 8.)

---

[1]     Under Scottish law, an insolvent company can end up
        in different types of proceedings, including
        liquidation and administration. . . .  The goal of
        a liquidation proceeding is to dissolve the
        company, sell the company's assets, and distribute
        the proceeds to creditors. . . .  If the court
        believes that the assets of the company are in
        danger of being dissipated before the hearing, the
        court will appoint a provisional liquidator to
        operate the company in a way that preserves the
        company's assets.

(Aff. of James Stephen ¶¶ 6-7 [hereinafter "Stephen Aff."];
accord COMPANIES HOUSE, LIQUIDATION AND INSOLVENCY (SCOTLAND) (2015)).

Mr. Turner asserts that, prior to January 2014, he was unaware of the outstanding tax assessment against Parkhouse Manor. (Turner Aff. ¶ 15.)  He further contends that at the time the petition for administration was filed, he was "ready, willing and able" to pay the tax assessment and had nearly concluded negotiations with the government that would have pulled Parkhouse Manor out of insolvency. (Id. ¶ 23.)  Mr. Turner also claims that he had kept Mr. Tabatznik apprised of his efforts. (Id. ¶ 25.)

The day before filing for administration, Mr. Tabatznik had informed Mr. Turner of his intention to do so. (See Second Mangold Decl. Ex. 16.)  According to Mr. Tabatznik, despite his assurances that the tax assessment would be paid, Mr. Turner had failed to articulate a clear plan for how and when that would be done. (Id.)  In the same correspondence, Mr. Tabatznik informed Mr. Turner that he was exercising his right to charge interest on the outstanding balance owed under the Note at the post-default rate of 10 percent from that day forward, as provided for in Section 3 of the Note. (Id.)

Through a letter dated March 21, 2014, Mr. Tabatznik demanded that Mr. Turner repay the full balance of the Note immediately. (Id.)  Then, on March 25, 2014, the Glasgow Sheriff Court granted Mr. Tabatznik's petition for an order of administration and appointed two administrators proposed by Mr.

10

Tabatznik (the "Joint Administrators") to replace the
provisional liquidator. (Stephen Aff. ¶ 3.)  Both Joint
Administrators are insolvency practitioners at BDO LLP, a UK
limited partnership accountancy and business advisory firm. (See
Young Decl. Ex. 1; Stephen Aff. ¶ 2.)

### G. Administration and Sale of Parkhouse Manor

The Joint Administrators reviewed Parkhouse Manor's assets,
liabilities, and operations, and determined that there was no
realistic way to pull the company out of insolvency. (Stephen
Aff. ¶¶ 9-10.)  On April 2, 2014, the Joint Administrators
placed Parkhouse Manor up for sale through Christie & Co. at a
list price of £2,000,000. (Turner Aff. ¶ 30.)  In mid-2014, a
buyer submitted an offer to purchase the company, but the deal
ultimately fell through. (Stephen Aff. ¶ 13.)  Because Parkhouse
Manor was in administration, the nursing home was not legally
permitted to admit new residents but was required to maintain
the same level of staffing, and the business began operating at
a loss. (Id. ¶ 15.)

### H. Initiation of this Action

On September 9, 2014, Mr. Tabatznik filed suit against Mr.
Turner in the Commercial Division of the New York State Supreme
Court (New York County), bringing the action as a motion for
summary judgment in lieu of complaint under N.Y. C.P.L.R.
§ 3213. (See Notice of Removal.)  Mr. Turner removed the case to

this Court on October 9, 2014, on the basis of diversity
jurisdiction.[2] (Id.)  Mr. Turner requested, and the Court allowed
for, discovery.  On March 16, 2015, Mr. Tabatznik renewed his
motion for summary judgment and also moved for interest, costs,
and attorney's fees.  Mr. Turner requested that the Court stay
consideration of the motions while the sale of Parkhouse Manor
was pending.

Following several delays, Parkhouse Manor was sold on June
12, 2015, for £1,325,000. (See Second Mangold Decl. Ex. 4.)
After reductions for operating losses during Parkhouse Manor's
sale; investments made to the premises in anticipation of sale;
and taxes, fees, and others costs, the net recovery from the
sale was £727,000. (Id.)  Mr. Tabatznik received a payment of
£650,000 from the sale on July 7, 2015. (See Letter from
Danielle L. Rose, Esq., ECF No. 47, at 4 n.3.)  As of August 12,
2015, Mr. Tabatznik was expected to receive the remaining
£77,000 at a later date but had deducted the full net proceeds

---

[2] Upon removal, a Section 3213 motion is converted to a motion
for summary judgment under Rule 56 of the Federal Rules of Civil
Procedure. See Valley Nat'l Bank v. Oxygen Unlimited, LLC, No.
10 Civ. 5815, 2010 WL 5422508, at *2 (S.D.N.Y. Dec. 23, 2010)
("Plaintiff's motion for summary judgment in lieu of complaint
will be treated as a motion for summary judgment made under Rule
56 of the Federal Rules and the papers already submitted to be a
complaint and answer.").

of £727,000 from the amount owed on the Note, leaving a
principal balance of £1,073,000. (Id.)

Following the sale, Mr. Turner sought supplemental briefing
to address the effect of the sale on his liability, which the
Court allowed.

## II. Motion for Summary Judgment

### A. Legal Standard

"[S]ummary judgment is appropriate where there exists no
genuine issue of material fact and, based on the undisputed
facts, the moving party is entitled to judgment as a matter of
law." Easterling v. Collecto, Inc., 692 F.3d 229, 233 (2d Cir.
2012) (internal quotation marks omitted).  When reviewing a
motion for summary judgment, a court must "resolve all
ambiguities and draw all permissible factual inferences in
favor" of the nonmoving party. Winfield v. Trottier, 710 F.3d
49, 52-53 (2d Cir. 2013) (internal quotation marks omitted).

### B. Prima Facie Case

Under New York law, to make out a prima facie case for
recovery on a promissory note "a plaintiff must simply show
proof of a note and failure to make payment." Camofi Master LDC
v. Coll. P'ship, Inc., 452 F. Supp. 2d 462, 470 (S.D.N.Y. 2006)
(quoting Eisenstein v. Kelly Music & Entm't Corp., No. 97 Civ.
4649(DC), 1998 WL 289734, at *4 (S.D.N.Y. June 4, 1998)).  "When
a note holder has established a prima facie claim, the burden

13

shifts to the defendant to prove the 'existence of a triable issue of fact in the form of a bona fide defense against the note.'" Id. (quoting Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Keenan, No. 93 Civ. 6784(LLS), 2005 WL 736233, at *1 (S.D.N.Y. Mar. 31, 2005)).

Here, it is undisputed that Mr. Tabatznik and Mr. Turner entered into a promissory note in the amount of £2,425,000, and that Mr. Turner defaulted on his payment obligations under the Note. (56.1(d) Statement ¶¶ 1, 20; see also Def. Mem., ECF No. 33, at 1 ("Defendant does not deny that he is liable under the Note . . . .").)  Thus, Mr. Tabatznik has established a prima facie claim for recovery on the Note.  The burden therefore shifts to Mr. Turner to present evidence from which a reasonable jury could find a bona fide defense to payment.

### C. Mr. Turner's Defenses

Although Mr. Turner does not dispute that he is liable under the Note, he raises two defenses challenging the amount of his liability.  First, Mr. Turner argues that there is a disputed issue of material fact regarding whether Tabatznik failed to mitigate damages by petitioning the Scottish court to put Parkhouse Manor into involuntary administration rather than allowing Mr. Turner additional time to attempt to pull Parkhouse Manor out of insolvency.  Second, Mr. Turner contends that there is a material dispute of fact regarding whether the sale of

14

Parkhouse manor was conducted in a commercially reasonable manner.  As explained below, both arguments are unavailing.

### 1. Failure to Mitigate Damages

Under New York law, "[a] plaintiff in a contract case is required to take reasonable actions to minimize its damages." Coastal Power Int'l, Ltd. v. Transcon. Capital Corp., 10 F. Supp. 2d 345, 370 (S.D.N.Y. 1998); accord Wechsler v. Hunt Health Sys., Ltd., 330 F. Supp. 2d 383, 427 (S.D.N.Y. 2004).  In asserting failure to mitigate damages as a defense, the defendant bears the burden of introducing evidence to prove that the plaintiff could have lessened its damages and acted unreasonably in failing to do so. See Wechsler, 330 F. Supp. 2d at 427.  So long as the plaintiff acts "within the range of reason, the defendant is liable for further damages resulting therefrom." Id. (quoting Ellerman Lines Ltd. v. The Steamship President Harding, 288 F.2d 288, 290 (2d Cir. 1961) (Friendly, J.)).

Here, Mr. Turner argues that Mr. Tabatznik failed to mitigate damages on the Note by bringing Parkhouse Manor into involuntary administration rather than allowing Mr. Turner additional time to attempt to pull Parkhouse Manor out of liquidation.  Mr. Turner contends that as a result of Mr. Tabatznik's actions, Parkhouse Manor was sold for less than it would have been otherwise.

15

As an initial matter, the Court questions whether, based on the record, any reasonable jury could find that Mr. Tabatznik acted outside the range of reason in exercising his right as a secured creditor to petition the Scottish courts for an order of administration.  At the time the petition for administration was filed, over 16 months had elapsed since Mr. Turner first defaulted on the Note, and Mr. Tabatznik had agreed to three separate forbearances.  The Court also notes that before the petition was filed, Parkhouse Manor was already involved in liquidation proceedings initiated by HRMC.  Although Mr. Turner asserts in his affidavit that he was "ready, willing and able" to pay the overdue tax assessment and pull Parkhouse Manor out of liquidation through negotiations with the government, he fails to specify how he planned to do so or to provide any supporting documentation demonstrating that the government had agreed to a resolution.

In any event, however, Mr. Turner waived his right to protest payment under the Note by agreeing to "pay all amounts due under any Loan Document . . . without set-off or counterclaim." (Second Mangold Decl. Ex. 1 § 7; see also id. § 1 (defining "Loan Document" to include the Note.))  "Under New York law, such a waiver among sophisticated parties is effective to overcome virtually any defense to enforcement." Camofi Master LDC, 452 F. Supp. 2d at 477 (quoting Internet Law Library, Inc.

16

v. Southridge Capital Mgmt., LLC, No. 01 CIV. 6600 (RLC), 2005
WL 3370542, at *7 (S.D.N.Y. Dec. 12, 2005)) (holding that
fraudulent inducement defense was barred by provision in
promissory notes providing that "[e]ach payment of principal and
of interest shall be paid . . . without setoff or
counterclaim"); see also Internet Law Library, 2005 WL 3370542,
at *7 (examining nearly identical waiver and finding that it
barred fraud defense), aff'd sub nom. ITIS Holdings Inc. v.
Southridge Capital Mgmt. LLC, 329 F. App'x 299 (2d Cir. 2009).

Mr. Turner is a sophisticated businessman who has been in
the nursing home industry for nearly 40 years and served as
founder, chairman, and chief executive officer of a nursing home
enterprise with sales of over $3.5 billion. (Turner Aff. ¶ 2.)
He was also represented by counsel in connection with the Note
and related transactions. (See 56.1(d) Statement ¶ 4.)  As a
result, the Court finds that Mr. Turner's waiver of his right to
protest payment under the Note is enforceable and precludes his
asserted defense for failure to mitigate damages.[3]

---

[3] In addition to the waiver provision in the Note, the Second and
Third Forbearance agreements each contain a waiver and release
of claims. (See Second Mangold Decl. Ex. 14 § F.2; id. Ex. 15 §
F.2.)  Because the Court finds that the terms of the Note are
sufficient to bar Mr. Turner's failure to mitigate damages
defense, the Court declines to consider whether the Second and
Third Forbearance agreements also preclude that defense.

## 2. Commercial Reasonableness

Mr. Turner next argues that to recover on the Note, Mr. Tabatznik must establish, pursuant to Article 9 of the New York Uniform Commercial Code ("U.C.C."), that the sale of Parkhouse Manor was conducted in a commercially reasonable manner. See N.Y. U.C.C. § 9-605 (requiring that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable"). According to Mr. Turner, because material issues of fact exist regarding the commercial reasonableness of the Parkhouse Manor sale, summary judgment is inappropriate.

The Court first notes that the New York U.C.C. does not apply to real property, which accounted for a substantial portion of the value associated with the Parkhouse Manor sale. See N.Y. U.C.C. § 9-109(d)(11) ("This article does not apply to . . . the creation or transfer of an interest in or lien on real property."); State Bank of Albany v. Fioravanti, 51 N.Y.2d 638, 643 (1980).  Thus, even if the New York U.C.C. did apply, it would not apply to the sale of the real property associated with Parkhouse Manor.

In any event, the New York U.C.C. does not control Mr. Tabatznik's obligations with respect to the security interests in Parkhouse Manor because those interests are governed by Scottish law.  Each Security Agreement provides that it "shall

18

be governed by[,] and construed in accordance with[,] the laws of Scotland." (Second Mangold Decl. Ex. 2 § 25.1; id. Ex. 3 § 15.1.)  In addition, the Security Agreements create and define the rights and obligations of the parties in connection with Scottish statutory provisions.  For example, the Floating Charges set forth the procedures by which Mr. Tabatznik may, after an Event of Default, "appoint one or more persons to be an Administrator in accordance with paragraph 14 of Schedule B1 to the Insolvency Act 1986." (Id. Ex. 2 § 9.1.4.)

Although the Note is governed by New York law, the Note specifically acknowledges that the security interests were created pursuant to the separate Security Agreements. (See id. Ex. 1 § 9(p) ("Each of the Mortgage, the Floating Charges and the Pledges will create in favor of [Mr. Tabatznik] a legal, valid, enforceable and perfected security interest in all right, title, and interest of Turner Healthcare, Aston or the Guarantors . . . ."); see also id. § 1 (defining "Mortgage" as "the Standard Security and Assignation of Rents."))  The Note further recognizes that different law applies to the agreements by defining "Floating Charges" as the "Scottish Law floating charges over the assets of the Guarantors." (Id. § 1.)

While the weight of New York authority holds that the New York U.C.C.'s commercial reasonableness requirement is not waivable, see Bank of China v. Chan, 937 F.2d 780, 785 (2d Cir.

19

1991), here, the Note and Security Agreement demonstrate that the parties intended the security interests to be governed by a different body of law.  Such an agreement is enforceable under New York choice of law principles so long as the chosen jurisdiction bears a reasonable relation to the transaction. See N.Y. U.C.C. § 1-301; Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 556 (2d Cir. 2000) ("New York law is clear in cases involving a contract with an express choice-of-law provision:  Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long the state selected has sufficient contacts with the transaction.").  Here, the transaction bears a reasonable relation to Scotland, where Parkhouse Manor is located, and Mr. Turner does not contend that the choice of Scottish law in the Security Agreements is unenforceable or violates public policy. As a result, commercial unreasonableness under Article 9 of the New York U.C.C. does not provide a valid defense to enforcement of the Note.

### D. Conclusion

In sum, because Mr. Tabatznik has established a prima facie claim for enforcement of the Note and Mr. Turner has failed to respond with evidence from which a reasonable jury could find a bona fide defense to payment, Mr. Tabatznik's motion for summary

judgment to enforce the principal balance of £1,073,000 owed on the Note is granted.

### III. Motion for Interest, Fees, and Costs

In addition to summary judgment on the principal balance under the Note, Mr. Tabatznik seeks to recover prejudgment interest on the principal, as well as fees and costs incurred in connection with enforcement.  As set forth below, the motion for interests, fees, and costs is granted in part and denied in part.

### A. Interest

Under New York law, a plaintiff in a breach of contract action is entitled to recover prejudgment interest. See NML Capital v. Rep. of Arg., 17 N.Y.3d 250, 258 (2011) (citing N.Y. C.P.L.R. § 5001).  The appropriate rate of prejudgment interest "varies depending on the nature and terms of the contract." Id. Where the parties set a contractual rate, that rate is used to calculate prejudgment interest accruing on principal prior to the loan's maturity or a default in performance. See id.  The parties may further specify the rate that will apply in the event of a default or acceleration of the debt. Id. at 262.  If the agreement fails to provide the applicable rate, New York's statutory rate will apply. Id. at 258.

In this case, the Note provides for an ordinary interest rate of 8 percent. (Second Mangold Decl. Ex. 1 § 3.)  The Note

further specifies that "in the case of any overdue amounts of
principal or interest, [Mr. Turner] shall pay interest on such
overdue amounts, on demand by [Mr. Tabatznik], at a rate per
annum equal to the ordinary interest rate provided above, plus
an additional 2.00% per annum." (Id.)  Mr. Turner paid interest
on the Note through January 31, 2014, which accrued at the
ordinary rate of 8 percent. (56.1(d) Statement ¶ 47.)  At that
time, Mr. Turner had overpaid the accrued interest by £13,185,
but made no further interest payments to Mr. Tabatznik. (Id.)

It is undisputed that between February 1, 2014, and March
21, 2014, when Mr. Tabatznik accelerated payment, interest
accrued according to the rates specified in the Note—
specifically, 8 percent per annum from February 1, 2014, through
February 11, 2014; and 10 percent per annum from February 12,
2014, through March 20, 2014.  However, Mr. Turner contends that
after the acceleration of the loan, the contractual rate of 10
percent ceased to apply because (1) under New York law, interest
is "unearned" after acceleration and (2) the Note does not
specify that the default rate applies following acceleration.
The Court disagrees.

First, Mr. Turner's reference to "unearned" interest is
misplaced.  As the New York Court of Appeals has explained,
"[u]nearned interest issues usually arise when repayment of the
loan is to occur in installments of combined principal and

22

interest over an extended time period and interest is
precomputed at loan commencement based on the assumption that
the loan will continue until full maturity." NML Capital, 17
N.Y.3d at 268 n.5 (2011).  When interest is pre-calculated in
that way and the loan is repaid earlier than expected, the
future interest payments are "unearned" and unrecoverable unless
the parties have agreed otherwise. See id.  Similarly, if the
outstanding balance on the loan is accelerated, the creditor
will not ordinarily be able to recover the previously scheduled
future interest payments in addition to prejudgment interest on
the accelerated amount of the loan because this would allow
double recovery of interest on the same principal. See Capital
Ventures Int'l v. Republic of Arg., 552 F.3d 289, 296-97 (2d
Cir. 2009).

     None of these restrictions preclude prejudgment interest in
this case.  The outstanding principal has not been repaid, and
Mr. Tabatznik seeks only to recover contractual prejudgment
interest, not all those additional interest payments that would
have come due had the Note continued to maturity through
September 2021.

     Mr. Turner's argument that the default rate does not apply
post-acceleration under the terms of the Note is likewise
unavailing.  The Note provides that the default rate of 10
percent would apply to "any overdue amounts of principal or

interest." (Second Mangold Decl. Ex. 1 § 3.)  When Mr. Tabatznik demanded full payment of the principal balance of £1,800,000 on March 21, 2014, that amount became "forthwith due and payable" under Section 12 of the Note. (See id. § 12.)  Thus, interest continued to accrue at the rate of 10 percent per annum on the outstanding balance of principal after acceleration.

In light of the Court's determination that he is entitled to unpaid prejudgment interest, Mr. Tabatznik is directed to, within 10 days of the date of this Order, electronically file an updated interest calculation in accordance with the Court's findings.  The interest calculation should reflect any deductions from the outstanding principal based on payments received from the sale of Parkhouse Manor since Mr. Tabatznik's last submission to the Court.

### B. Attorney's Fees and Costs

Under Section 17 of the Note, Mr. Turner agreed to pay or reimburse Mr. Tabatznik for reasonable out-of-pocket costs and expenses "including, without limitation, the reasonable fees and expenses" of various legal counsel associated with certain events. (Second Mangold Decl. Ex. 1 § 17.)  Mr. Tabatznik seeks to recover both his attorney's fees associated with this litigation ("Kobre & Kim Fee Application") and his attorney's fees associated with Scottish administration proceedings ("MMS Fee Application") under Section 17.

24

### 1. Legal Standard

New York follows the so-called American Rule that "attorneys' fees are the ordinary incidents of litigation and may not be awarded to the prevailing party unless authorized by agreement between the parties . . . ." Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 199 (2d Cir. 2003). "[P]arties may agree by contract to permit recovery of attorneys' fees, and a federal court will enforce contractual rights to attorneys' fees if the contract is valid under applicable state law." U.S Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 74 (2d Cir. 2004). The fee applicant bears the burden of demonstrating entitlement to an award, Hensley v. Eckerhart, 461 U.S. 424, 437 (1983), and contracts shifting attorney's fees "must be strictly construed to avoid inferring duties that the parties did not intend to create." U.S. Fid. & Guar. Co., 369 F.3d at 75.

If a contract provides a plaintiff the right to recover attorney's fees, the court must calculate a "presumptively reasonable fee." Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany, 522 F.3d 182, 190 (2d Cir. 2007). A presumptively reasonable fee equals the product of a reasonable hourly rate in the community and the reasonable number of hours required by the case. Millea v. Metro-N. R.R. Co., 658 F.3d 154, 166 (2d Cir. 2011).

The first variable in the presumptively reasonable fee
equation—the reasonable hourly rate in the community—is the rate
a paying client in the district where the court sits would be
willing to pay. Arbor Hill, 552 F.3d at 190.  To determine this
number, the Second Circuit directs its district courts to
consider "all of the case-specific variables that [it] and other
circuits have identified as relevant to the reasonableness of
attorney's fees in setting a reasonable hourly rate." Id.[4]

---

[4]  These factors are numerous.  The Arbor Hill court identifies
at least twenty-one.  These include:  (1) the complexity and
difficulty of the case, (2) the available expertise and capacity
of the client's other counsel (if any), (3) the resources
required to prosecute the case effectively (taking account of
the resources being marshaled on the other side but not
endorsing scorched earth tactics), (4) the timing demands of the
case, (5) whether an attorney might have an interest
(independent of that of his client) in achieving the ends of the
litigation or might initiate representation himself, (6) whether
an attorney might have acted pro bono (such that a client might
be aware that the attorney expected low or non-existent
remuneration), (7) other returns (such as reputation, etc.) that
an attorney might expect from the representation, (8) the time
and labor required, (9) the novelty and difficulty of the
questions, (10) the level of skill required to perform the legal
service properly, (11) the preclusion of employment by the
attorney due to acceptance of the case, (12) the attorney's
customary hourly rate, (13) whether the fee is fixed or
contingent, (14) the time limitations imposed by the client or
the circumstances, (15) the amount involved in the case and the
results obtained, (16) the experience, reputation, and ability
of the attorneys, (17) the "undesirability" of the case,
(18) the nature and length of the professional relationship with
the client, (19) awards in similar cases, (20) that a
reasonable, paying client wishes to spend the minimum necessary
to litigate the case effectively, and (21) that a reasonable,
paying client might be able to negotiate with his or her
attorneys, using their desire to obtain reputational benefits

The second variable is the reasonable number of hours required by the case.  While the fee applicant bears the burden of documenting the appropriate hours expended, Hensley, 461 U.S. at 437, "the district court does not play the role of an uninformed arbiter [and] may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." DiFilippo v. Morizio, 759 F.2d 231, 236 (2d Cir. 1985).  This determination asks "whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." Grant v. Bethlehem Steel Corp., 973 F.2d 96, 99 (2d Cir. 1992).  "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." Hensley, 461 U.S. at 433.

Additionally, an award of attorney's fees "include[s] those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 763 (2d Cir. 1998) (quoting U.S. Football League v. Nat'l Football League, 887 F.2d 408, 416 (2d Cir. 1996)).  Such expenses exclude an "attorney's ordinary overhead," but typically include reproduction, travel, telephone, and legal research expenses. Id.

---

that might accrue from being associated with the case. Arbor Hill, 522 F.3d at 184, 186 n.3, 190.

## 2. The Kobre & Kim Fee Application

Mr. Turner argues that Mr. Tabatznik's Kobre & Kim Fee Application should be denied or reduced because (1) the attorney's and support staff's fees are unreasonable, (2) the time billed is unreasonable, (3) the documentation for certain months is insufficient, and (4) Section 17 of the Note does not permit Mr. Tabatznik to recover "fees on fees." For the reasons stated below, Mr. Tabatznik's Kobre & Kim Fee Application is approved as modified.

### a. Kobre & Kim's Reasonable Hourly Rate

Kobre & Kim assigned a team of two attorneys and two paralegals to Mr. Tabatznik's case. (See Decl. of Danielle L. Rose ¶ 8 (Feb. 2, 2015) [hereinafter "First Rose Decl."].) The attorneys are partner Danielle L. Rose, whose billing rate is $825, and associate Kimberly Cole, whose billing rate is $560.[5] (Id. ¶¶ 8-11.) The paralegals are "senior legal analyst" Emily Wanger, whose billing rate is $375, and "litigation assistant"

---

[5] Kobre & Kim promoted Ms. Cole to partner in January 2015. (Mem. of Law in Support of Pl. Anthony Tabatznik's Mot. for Interest, Fees & Costs 11 n.6 [hereinafter, "Mem."]; Reply Mem. of Law in Support of Pl. Anthony Tabatznik's Mot. for Interest, Fees & Costs 7 n.5 [hereinafter, "Reply"].) It continued to bill Mr. Tabatznik for Ms. Cole's work at her associate rate through February 2, 2015, thereafter, associate Rebecca G. Mangold, whose billing rate is also $560, replaced Ms. Cole. (See generally Notice of Appearance by Rebecca G. Mangold, ECF No. 35 (Mar. 17, 2015); Decl. of Rebecca G. Mangold, ECF No. 47-1 (Aug. 12, 2015); id. Ex. 2.)

Jessica Maynor, whose billing rate is $185. (Id. ¶ 11.)  Various other senior legal analysts and litigation assistants provided services for discrete tasks at rates equal to Mses. Wanger and Maynor. (Id. ¶ 10.)

### (1) Reasonable Rate for Attorneys

Mses. Rose, Cole, and Mangold are each highly qualified commercial litigators.  After receiving her Bachelor of Arts degree from Princeton University and her Juris Doctor degree from Harvard Law School, Ms. Rose clerked for Judge Sand in the Southern District of New York. (First Rose Decl. ¶ 9; id. Ex. II.)  She entered private practice in 2002. (First Rose Decl. ¶ 9; id. Ex. II.)  Ms. Cole received her Bachelor of Arts degree from American University and her Juris Doctor degree from Georgetown University Law Center. (First Rose Decl. ¶ 9; id. Ex. II.)  She then clerked for Judge Bates in the D.C. District Court and entered private practice in 2006. (First Rose Decl. ¶ 9; id. Ex. II.)  Ms. Mangold received her Bachelor of Arts degree from U.C.L.A. and her Juris Doctor degree from Harvard Law School. (Rebecca G. Mangold, KOBRE & KIM, http://kobrekim.com/our-team/lawyers/rebecca-g.-mangold/ (last visited Mar. 30, 2016).)  She then clerked for Judge Martini in the District of New Jersey and entered private practice in 2009. (Id.; Attorney Search, N.Y. ST. UNIFIED CT. SYS.,

https://iapps.courts.state.ny.us/attorney/AttorneySearch (last visited Mar. 30, 2016).)

Mr. Tabatznik supports his argument that Kobre & Kim's rates are reasonable in part by citation to Ceglia v. Zuckerburg, No. 10 Civ. 569A(F), 2012 WL 503810, at *15 (W.D.N.Y. Feb. 14, 2012), and In re AOL Time Warner Shareholder Derivative Litigation, No. 02 Civ. 6302(CM), 2010 WL 363113, at *13 (S.D.N.Y. Feb. 1, 2010). (See Reply 9.)  These cases offer limited guidance for the case before this Court.

Ceglia involved attorney's fees imposed as a sanction in connection with an accelerated motion to compel. Ceglia, 2012 WL 503810, at *3.  Attorney's fees as sanctions may serve in some part as compensation, but the principal objective of such an award is to deter abusive litigation practices. Id. at *7. Moreover, Ceglia involved "forensic procedures not typically seen in th[at] court," involving computer and technology proficiency as well as handwriting and document authentication and "the litigation skills, technical knowledge, and experience of counsel capable of marshaling such relevant evidence and expertise." Id. at *11.  Even so, the Western District of New York did not find rates as high as those here to be reasonable. Rather, counsel voluntarily reduced its rates by 25 percent, resulting in rates for junior associates of $337.50 and for senior partners of $716.25. Id. at *15.

In re AOL involved attorney's fees arising out of class-action litigation's "common fund doctrine." In re AOL, 2010 WL 363113, at \*4.  In re AOL was "the last in a trilogy of large scale matters" and "raise[d] some complicated and novel issues, including . . . cutting-edge changes in corporate governance." Id. at \*1.  The Court found ranges of rates for paralegals from $90 to $250, for associates from $175 to $550, and for partners from $300 to $850, to be "relatively high" but reasonable. Id. at \*13.

By contrast, this Court has recently considered awards of attorney's fees in an action to enforce a promissory note on at least two occasions. See Rubenstein v. Advanced Equities, Inc., No. 13 Civ. 1502 (PGG), 2015 WL 585561 (Feb. 10, 2015); Nautilus Neurosciences, Inc. v. Fares, No. 13 Civ. 1078 (SAS), 2014 WL 1492481 (Apr. 16, 2014).  In Nautilus, the Court determined that rates voluntarily discounted by 10 percent to $603 for a partner admitted to the bar in 1987 and $337.50 for an associate admitted to the bar in 2011 were reasonable. Nautilus, 2014 WL 1492481, at \*2-3.  In Rubenstein, the Court determined that rates of $525 for partners with between twenty and thirty years' experience and a "blended" rate of $350 for associates with experience ranging from recent law school graduate to nine years were reasonable. Rubenstein, 2015 WL 585561, at \*6-7.

Additionally, this enforcement action is not overly complex.  Mr. Tabatznik's counsel does not suggest that its particular expertise, like in <u>Ceglia</u>, or any novel issues raised by the facts, like in <u>In re AOL</u>, warrant a significant upward departure in the reasonable rates charged by attorneys in the Southern District of New York for representation in cases seeking enforcement of promissory notes.  Nevertheless, this action does involve multiple transactions and the law of several jurisdictions, and these elements complicate what typically may be a routine cause of action.  Therefore, this case required a higher level of skill to perform the legal service properly than a run-of-the-mill enforcement action and an extreme downward departure from Kobre & Kim's customary rates is also not warranted.

Balancing the factors identified by the Second Circuit in <u>Arbor Hill</u> and enumerated above, Kobre & Kim's fees should be reduced in order to reflect a reasonable hourly rate for attorney services in this matter.  The Court will apply a partner rate of $650 and an associate rate $425.

### (2) The Reasonable Rate for Non-Attorneys

Mr. Tabatznik's briefing and affidavits fail to provide any description for the distinction between a "legal analyst" or "litigation assistant" or how one in either position qualifies as "senior." (<u>See</u> First Rose Decl. ¶¶ 9-10.)  The "senior"

designation does not affect billing rates, as all legal analysts on this matter billed at $375 and all litigation assistants billed at $185.  Both rates exceed the reasonable rate in this district for paralegal services.

In Rubenstein, this Court rejected a paralegal rate of $275, concluding that the paralegal rate in the Southern District of New York was generally "significantly below" $275. Rubenstein, 2015 WL 585561, at *7.  The court applied a rate of $140 per hour. Id.  Review of contemporaneous cases in the Southern District of New York—albeit for different causes of action—suggest that paralegal fees range between $100 and $280. See, e.g., Doe v. Unum Life Ins. Co. of Am., No. 12 Civ. 9327(LAK)(AJP), 2016 WL 335867, at *6 (S.D.N.Y. Jan. 28, 2016) (approving $200 paralegal rate); Tackney v. WB Imico Lexington Fee, LLC, No. 10 Civ. 2734(PGG), 2015 WL 1190096, at *5 (S.D.N.Y. Mar. 16, 2015) (approving $135 paralegal rate); Genger v. Genger, No. 14 Civ. 5683, 2015 WL 1011718, at *3 (S.D.N.Y. Mar. 9, 2015) (approving a paralegal rate of $260-80 even though it "might reflect some degree of largesse"); Sprint Commc'ns Co. v. Chong, No. 13 Civ. 3846 (RA), 2014 WL 6611484, at *8 (S.D.N.Y. Nov. 21, 2014) (approving $180-205 paralegal rate); Berrian v. City of N.Y., No. 13 Civ. 1719(DLC)(DF), 2014 WL 6611356, at *7 (S.D.N.Y. July 28, 2014) (approving $100 paralegal rate).

As with the attorney rates, the Mr. Tabatznik does not suggest that any particular expertise, novel issue, or other Arbor Hill factor arose to warrant an increase in the paralegal rate.  Considering the complexity of this multitransaction, multijurisdictional case, the Court will apply a paralegal rate of $200.

### b. Kobre & Kim's Reasonable Expended Time

In addition to determining the presumptively reasonable fee, the Court must determine the reasonable number of hours required by the case.  This analysis requires the Court to exclude "hours that are excessive, redundant, or otherwise unnecessary." Hensley, 461 U.S. at 434.  "The guiding principle to determine whether redundancy has occurred is the 'degree of effort reasonably needed to prevail in this litigation.'" Rubenstein, 2015 WL 585561, at *8 (quoting N.Y. State Ass'n for Retarded Children v. Carey, 711 F.2d 1136, 1146 (2d Cir. 1983)).

While the Second Circuit "do[es] not require that the court set forth item-by-item findings concerning what may be countless objections to individual billing items," a district court must ensure that counsel exercises "billing judgment," complying with ethical and market restraints that counsel would encounter in billing its own clients. Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir. 1994).  A court may deduct a reasonable percentage

of the number of hours claimed "as a practical means of trimming fat from a fee application." Carey, 711 F.2d at 1146.

Mr. Tabatznik submits itemized billing records covering the period from July 1, 2014, through June 30, 2015. (See First Rose Decl. Ex. I; Second Decl. of Danielle L. Rose Ex. B; First Mangold Decl. Ex. A.)  These billing records total 108.6 partner hours, 282.5 associate hours, and 419.1 paralegal hours.  Mr. Turner singles out several entries as examples of redundancy and objects to Mr. Tabatznik's counsel's use of "block-billing," i.e. the grouping together of tasks performed on a single day with one associated total hour figure.

The Court has carefully reviewed Mr. Tabatznik's counsel's billing entries and its explanation for those entries identified by Mr. Turner as redundant and finds that the hours expended by Mr. Tabatznik's counsel are reasonable.  Mr. Tabatznik's counsel's billing records demonstrate that it maintained a lean staff of two attorneys and two paralegals and it assigned tasks according to appropriate experience level.  Associate and paralegal level work accounted for more than 82 percent of the time spent on this case. See Rubenstein, 2015 WL 585561, at *8.

Mr. Tabatznik's counsel has provided lengthy, detailed descriptions of all of the work for which Mr. Tabatznik seeks to recover attorney's fees.  The Court declines to apply a reduction for Mr. Tabatznik's counsel's use of block billing.

While block billing may impede the court's efforts to evaluate the reasonableness of any of the listed activities, see Berry v. Deutsche Bank Tr. Co., 632 F. Supp. 2d 300, 306 (S.D.N.Y. 2009), that is not the case here.  Mr. Tabatznik's counsel's block billing entries aggregate only several tasks per day and provide sufficient detail about each task for the Court to determine that the total amount of time devoted to those tasks is reasonable.

Additionally, Mr. Tabatznik's counsel employed a litigation strategy aimed at keeping costs low, which Mr. Turner's own actions ultimately prevented.  Mr. Tabatznik originally filed a motion for summary judgment in lieu of complaint in state court. Mr. Turner removed the action to federal court, sought a stay of the action pending the resolution of the Scottish administration proceedings, and sought largely unnecessary discovery.  While Mr. Turner's choice of litigation strategy is his own to make, where he has agreed to pay Mr. Tabatznik's fees, those too are his own to bear. See Nautilus, 2014 WL 1492481, at *3.

Accordingly, the Court finds that the 108.6 partner hours, 282.5 associate hours, and 419.1 paralegal hours expended by Kobre & Kim are reasonable.

### c. Kobre & Kim's Documentation

In addition to challenging Mr. Tabatznik's counsel's use of block billing, Mr. Turner argues that the billing records are

insufficient due to certain redactions.  This argument is
unpersuasive.

State law governs privilege in a civil case where state law
supplies the rule of decision. FED. R. EVID. 501.  Under New York
law, attorney's bills and time records are not necessarily
protected by attorney-client privilege. See DiBella v. Hopkins,
403 F.3d 102, 120 (2d Cir. 2005).  When such records are
"detailed in showing services, conversations, and conferences
between counsel and others to such an extent that to allow
access to the material would disclose trial strategy, and reveal
the legal work that has been done by the party's attorneys,"
however, the records are protected by attorney-client privilege
in New York. Id. (alterations omitted) (quoting Licensing Corp.
of Am. v. Nat'l Hockey League Players Ass'n, 153 Misc. 2d 126,
128 (N.Y. Sup. Ct. 1992)).

Mr. Tabatznik's redaction of billing records is limited to
descriptions of specific work performed that would disclose
trial strategy and reveal the legal work that counsel performed.
These redactions do not impede the Court's ability to determine
whether the hours attributed to the work performed was
reasonable.  Accordingly, the Court will not reduce the
presumptively reasonable fee because of these reasonable
redactions.

37

### d. Kobre & Kim's Fees on Fees

Mr. Turner contests Mr. Tabatznik's right to recover for time that his counsel spent working on the fee application itself. "In New York, 'an award of fees on fees must be based on a statute or on an agreement.'" <u>546-552 W. 146th St. LLC v. Arfa</u>, 99 A.D.3d 117, 120 (1st Dep't 2012) (quoting <u>Sage Realty Corp. v. Proskauer Rose</u>, 288 A.D.2d 14, 15 (1st Dep't 2001)). New York courts require that the parties' intention to shift costs for fees on fees be "<u>unmistakably</u> <u>clear</u> from the language of the promise." <u>Id.</u> (quoting <u>Hooper Assoc. v. AGS Computs.</u>, 74 N.Y.2d 487, 492 (1989)).

The first paragraph of Section 17 of the Note is as follows:

> <u>Expenses, etc.</u> [Mr. Turner] agrees to pay or reimburse [Mr. Tabatznik] for (a) all reasonable out-of-pocket costs and expenses of [Mr. Tabatznik] (including, without limitation, the reasonable fees and expenses of Wachtell, Lipton, Rosen & Katz, New York counsel to [Mr. Tabatznik], and Maclay Murray & Spens, Scottish counsel to [Mr. Tabatznik]) in connection with (i) the negotiation, preparation, execution and delivery of this Note and the other Loan Documents and the making of the Loan; provided that such costs and expenses shall not exceed in the aggregate GBP£25,000 and (ii) the negotiation or preparation or any modification, supplement or waiver of any of the terms of this Note or any of the other Loan Documents (whether or not consummated); (b) all reasonable out-of-pocket costs and expenses of [Mr. Tabatznik] (including, without limitation, the reasonable fees and expenses of legal counsel) in connection with (i) any Default and any enforcement or collection proceedings resulting therefrom, including without limitation, all manner of participation in or other involvement with

(x) bankruptcy, insolvency, sequestration, receivership, foreclosure, winding up or other liquidation proceedings, (y) judicial or regulatory proceedings and (z) workout, restructuring or other negotiations or proceedings (whether or not the workout, restructuring or transaction contemplated thereby is consummated) and (b) [sic] the enforcement of this Section 17; and (c) all transfer, stamp, documentary or similar taxes assessments or charges levied by any Governmental Authority in respect of this Note or any of the other Loan Documents or any other document referred to herein or therein and all costs, expenses, taxes, assessments and other charges incurred in connection with any filing, registration, recording or perfection of any security interest contemplated by any Loan Document or any other document referred to therein.

(Second Mangold Decl. Ex. 1 § 17.)

Mr. Turner argues that the language "[Mr. Turner] agrees to pay or reimburse [Mr. Tabatznik] for . . . (b) all reasonable out-of-pocket costs and expenses of [Mr. Tabatznik] (including, without limitation, the reasonable fees and expenses of legal counsel) in connection with . . . (b) [sic] the enforcement of this Section 17 . . . ," is not an unmistakably clear manifestation of his intention to cover the fees for enforcing section 17. He claims that the typographical error that creates two subsections (b) causes ambiguity as to whether the "the enforcement of this Section 17" language includes "reasonable fees and expenses of legal counsel." Mr. Turner urges this Court to read the second subsection (b) as an independent subsection, so that Section 17 would read in pertinent part: "[Mr. Turner] agrees to pay or reimburse [Mr. Tabatznik] for

39

. . . (b) the enforcement of this Section 17 . . . ."  Mr.
Turner's argument continues that, since this reading would
eliminate an explicit reference to attorney's fees with regards
to enforcement of Section 17, the parties' intent for Mr. Turner
to pay fees on fees is not unmistakably clear, and should not be
enforced. (Def.'s Supp. Reply 4-7.)

Mr. Turner offers one ground to support his reading:  the
placement of the conjunction "and" before both subsection (z)
and second subsection (b).  This, he claims, is proof that the
first subsection (b) was only supposed to have one subsection
(i) containing three subparts (x), (y), and (z). (Id.)

The Court believes Mr. Turner's reading to be particularly
strained for several reasons, including that such a reading
ignores the conjunction "and" prior to subsection (c) and
ignores the presence of secondary (e.g., subsection (i)) and
tertiary (e.g., subparts (x), (y), (z)) divisions within the
first subsection (b).  The clause is unambiguous and makes it
unmistakably clear that the parties intended Mr. Turner to pay
or reimburse Mr. Tabatznik for the fees on fees.

Under New York law, unambiguous contract provisions must be
given their plain and ordinary meaning. Universal Am. Corp. v.
Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 25 N.Y.3d 675, 680
(2015).  Under Mr. Turner's reading, he agreed to pay or
reimburse Mr. Tabatznik for the enforcement of Section 17

itself.  This agreement is in addition to the agreement to pay
or reimburse for the underlying litigation and attorney's fees
in subsection (i)(y) of the first subsection (b) of Section 17.
In order to "enforce" Section 17, Mr. Tabatznik must necessarily
file the fee application at issue here.

It is common practice for New York courts to refer to the
dictionary to determine the plain and ordinary meaning of words
to a contract. Mazzola v. Cty. of Suffolk, 143 A.D.2d 734, 735
(2d Dep't 1988).  Black's Law Dictionary defines "enforcement"
as "[t]he act or process of compelling compliance with a law,
mandate, command, decree, or agreement." Enforcement, BLACK'S LAW
DICTIONARY (10th ed. 2014).  Similarly, Webster's Third New
International Dictionary defines "enforcement" as "the act of
enforcing:  such as . . . the compelling of the fulfillment (as
of a law or order)." Enforcement, WEBSTER'S THIRD NEW INT'L DICTIONARY,
UNABRIDGED (2016).  Thus, standing alone, the agreement to pay for
the "enforcement" of Section 17 envisions payment for the fee
application here, which is the "act or process of compelling
compliance" available to Mr. Tabatznik.

Alternatively, under New York law, "courts may as a matter
of interpretation carry out the intention of a contract by
transposing, rejecting, or supplying words to make the meaning
of the contract more clear." Wallace v. 600 Partners Co., 86
N.Y.2d 543, 547 (1995).  "However, such an approach is

41

appropriate only in those limited instances where some absurdity
has been identified or the contract would otherwise be
unenforceable either in whole or in part." Id.; accord Ross v.
Shearman, 95 A.D.3d 1100, 1101 (2d Dep't 2012) (holding that a
contract providing for payment of a losing party's attorney's
fees was absurd and reading the contract to require payment of
the prevailing party's attorney's fees).

Here, Mr. Turner's reading of Section 17 would render the
clause a nullity and, therefore, unenforceable.  Mr. Turner's
agreement "to pay or reimburse [Mr. Tabatznik] for . . . (b) the
enforcement of this Section 17 . . . ," but not including "the
reasonable fees and expenses of legal counsel in connection
with" its enforcement would foreclose recovery for Mr. Tabatznik
of the only expenses related to enforcement of Section 17.
Accordingly, the Court will transpose the second subsection (b)
to become subsection (ii) under the first subsection (b).
Section 17 shall read, in pertinent part:  "[Mr. Turner] agrees
to pay or reimburse [Mr. Tabatznik] for . . . (b) all reasonable
out-of-pocket costs and expenses of [Mr. Tabatznik] (including,
without limitation, the reasonable fees and expenses of legal
counsel) in connection with . . . (ii) the enforcement of this
Section 17."

### 3.   The MMS Fee Application

Mr. Turner also argues that Mr. Tabatznik's MMS Fee Application should be denied or reduced because (1) the documentation for MMS's fees is insufficient and (2) Mr. Tabatznik fails to satisfy his burden of demonstrating that the fees and work performed in a foreign legal proceeding were reasonable. (See Def.'s Opp'n 15-16; Def.'s Sur-Reply 3).  For the reasons stated below, Mr. Tabatznik's MMS Fee Application is denied.

While it is ultimately within the court's discretion to determine the reasonableness of the requested fee, "the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984).  Ideally, evidence of the prevailing market rate should include affidavits from attorneys with similar qualifications stating "the affiant's personal knowledge of specific rates charged by other lawyers for similar litigation, data about fees awarded in analogous cases, evidence of the fee applicant's rates during the relevant time period, and evidence submitted by other fee applicants in like cases." Wilder v.

<u>Bernstein</u>, 975 F. Supp. 276, 281 (S.D.N.Y. 1997); <u>accord</u> <u>Ceglia</u>, 2012 WL 503810, at *14.

Mr. Tabatznik has provided no evidence of the prevailing market rate for attorneys who provide their services in administration proceedings in Glasgow, Scotland.  Therefore Mr. Tabatznik has failed to meet his burden to produce satisfactory evidence of the prevailing rates in the relevant community.  Accordingly, the Court denies the MMS Fee Application.

### D. Costs

The fee applicant also bears the burden of adequately documenting and itemizing the costs it requests. <u>See</u> <u>Brig v. Port Auth. Trans Hudson</u>, No. 12 Civ. 5371(RPP), 2014 WL 1318345, at *6 (S.D.N.Y. Mar. 28, 2014); <u>see also</u> <u>Tr. of Empire State Carpenters Annuity v. Fourmen Constr., Inc.</u>, No. 15 Civ. 3252, 2016 WL 146245 (E.D.N.Y. Jan. 13, 2016); <u>cf.</u> S. & E.D.N.Y. Local Civ. R. 54.1(a) ("The bill of costs shall include an affidavit that the costs claimed are allowable by law, are correctly stated and were necessarily incurred.  Bills for the costs claimed shall be attached as exhibits.")

The Kobre & Kim Fee Application itemizes three costs:  (1) $305.00 in electronic filing fees to the Clerk of the Supreme Court of New York; (2) $310.00 in process server fees; and (3) $163.00 in vendor charges associated with document production.

44

(<u>See</u> First Rose Decl. ¶¶ 12, 14; <u>id.</u> Ex. I.)  In addition, it seeks to recover for a "2% Administrative Charge" on each bill, which totals $7,231.42.  Ms. Rose explains that this 2 percent fee is charged "in lieu of costs and disbursements that law firms routinely charge on an itemized basis, including regular online legal research fees, international and domestic long-distance telecommunications fees, late night work expenses, routine duplication, and other similar items." (Second Rose Decl. ¶ 7.)  By contrast, the MMS Fee Application provides detailed and itemized disbursements totaling £1,101.73. (<u>See</u> First Edward Decl. Ex. 2; Second Decl. of Timothy James Edward Ex. A.)

The Court finds that Mr. Tabatznik has met his burden for costs of $778.00 for the electronic filing fees, process server fees, and vendor charges associated with the Kobre & Kim Fee Application and £1,101.73 for the various costs individually identified and itemized by the MMS Fee Application.  The remaining unitemized and undocumented charges subsumed in Kobre & Kim's blanket 2 percent administrative charge are denied.

### Conclusion

As set forth above, Mr. Tabatznik's motion for summary judgment is granted and his motion for interest, fees, and costs is granted in part and denied in part.  The Clerk of the Court is respectfully directed to close both motions (ECF Nos. 18 &

20).  Mr. Tabatznik is instructed to electronically file an updated interest calculation with the Court within 10 days of the date of this Order.

**SO ORDERED.**

Dated:     New York, New York
           March 30, 2016

                                    _____
                                         Hon. John F. Keenan
                                    United States District Judge